Approved: _____
THANE REHN/CECILIA VOGEL
Assistant United States Attorneys

Before: THE HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - v. -

SHUKHRATJON MIRSAIDOV,

            Defendant.

**SEALED**

**COMPLAINT**

Violations of
18 U.S.C. §§ 371 and
1956(h)

COUNTY OF OFFENSE:
NEW YORK

- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

      Ali Amhaz-Strickland, being duly sworn, deposes and says that he is a Special Agent with Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**

(Conspiracy to Commit Money Laundering)

     1.  From at least in or about June 2019, up to and including the present, in the Southern District of New York and elsewhere, SHUKHRATJON MIRSAIDOV, the defendant, and others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other to engage in money laundering offenses, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

     2.  It was a part and an object of the conspiracy that SHUKHRATJON MIRSAIDOV, the defendant, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of

specified unlawful activity, to wit health care fraud, in violation of Title 18, United States Code, Section 1347, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h).)

## COUNT TWO

(Conspiracy to Operate an
Unlicensed Money Transmitting Business)

3.  From at least in or about June 2019, up to and including the present, in the Southern District of New York and elsewhere, SHUKHRATJON MIRSAIDOV, the defendant, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to operate an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960.

4.  It was a part and object of the conspiracy that SHUKHRATJON MIRSAIDOV, the defendant, and others known and unknown, knowingly would and did conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, which (a) was operated without an appropriate money transmitting license in a State where such operation was punishable as a misdemeanor and a felony under State law, and (b) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, to wit, MIRSAIDOV used a bank account held by a U.S.-based subsidiary of a foreign airline company (the "Company"), where MIRSAIDOV was an employee, to transmit money from, through, and out of the United States, including money transmitted through the Southern District of New York, without an appropriate state license, which conduct was punishable as a crime under New York and New Jersey law, and without meeting the Federal registration requirements set forth for money transmitting businesses.

Overt Acts

5.  In furtherance of said conspiracy and to affect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

   a.  On or about September 14, 2021, an individual who is not an employee of the Company ("CC-1") delivered approximately $33,700 in U.S. currency to a confidential source ("CS-1") [1] in Manhattan in exchange for checks CS-1 had previously provided to CC-1 that were deposited into a bank account of the Company (the "Company Bank Account").

   b.  On or about July 28, 2021, CS-1 had a recorded meeting with SHUKHRATJON MIRSAIDOV, the defendant, at the Company's office, during which MIRSAIDOV explained to CS-1, in substance, that MIRSAIDOV collected checks from CC-1 and in exchange provided CC-1 with U.S. currency.

   (Title 18, United States Code, Section 371.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6.  I am a Special Agent with FBI and I have been personally involved in the investigation of this matter.  This affidavit is based upon my investigation, my conversations with witnesses and other law enforcement agents, and my review of bank records and websites.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Overview

7.  Since in or about 2021, the FBI has been investigating SHUKHRATJON MIRSAIDOV, the defendant, for his role in using assets of the Company in furtherance of an unlicensed money remitting scheme and the laundering of criminal proceeds,

---

[1] CS-1 is a paid informant.  To date, the information provided by CS-1 has been reliable and corroborated by other evidence.

particularly proceeds derived from medical offices and clinics involved in healthcare and insurance fraud schemes. During its investigation, the FBI learned that the Company Bank Account was receiving hundreds of thousands of dollars in checks from shell companies identified by the FBI as involved in laundering health care and insurance fraud proceeds.  With the assistance of CS-1 and an undercover agent, the FBI conducted a series of sting transactions that demonstrated that SHUKHRATJON MIRSAIDOV, the defendant, an employee of the Company with access to and shared control of the Company Bank Account, was conspiring with CC-1 to use the Company Bank Account to launder healthcare and insurance fraud proceeds and operate an unlicensed money transmitting business.  The sting transactions showed that MIRSAIDOV, working with CC-1, deposited into the Company Bank Account checks from shell companies that received healthcare and insurance fraud proceeds and provided cash in exchange for the checks.

    8.   Based on my review of law enforcement databases, I have learned that the Company is not licensed to operate a money transmitting business in any state or federally.

The Company's Connection to the
Healthcare and Insurance Fraud

    9.   Based on my review of bank records for the Company Bank Account and various shell companies, I have learned the following, among other things:

    a. SHUKHRATJON MIRSAIDOV, the defendant, is one of two signatories for the Company Bank Account.

    b. For the period between approximately November 1, 2019 and July 31, 2021, the Company Bank Account received substantial check deposits from a number of known shell companies that appear to have no relation to the airline industry and which the FBI has identified as involved in laundering healthcare and insurance fraud proceeds. The check deposits from the shell companies are frequently in round dollar amounts of approximately $5,000 or less, and multiple checks from the same shell company are often deposited on the same day.  Based on my training, experience, and involvement in the investigation, these check deposits are consistent with structuring designed to avoid detection by the bank and are inconsistent with payments for airline ticket purchases, which are typically not in round dollar amounts due to taxes and fees.

4

c. Specifically, for the period between approximately June 2019 and August 2021, the FBI to date has identified check deposits in the Company Bank Account from at least five shell companies that received payments from a doctor engaged in a fraudulent billing scheme ("Doctor-1"). The Company Bank Account received approximately 85 checks totaling approximately $362,252 in deposits from these five shell companies. Based on my review of bank records of another shell company for the period between approximately June 2019 and September 2021, I have learned the Company Bank Account received approximately 24 checks totaling approximately $103,905 in deposits from a shell company whose account holder is also the account holder of one of the five shell companies. Based on my review of bank records of an additional shell company for the period from approximately January 2019 to December 2021, I have learned the Company Bank Account received approximately four checks totaling approximately $28,014 from a shell company that received payments from several of the five shell companies funded in part by Doctor-1.

d. Based on my review of bank records for these seven shell companies, I have learned that the seven shell companies are primarily funded by payments from companies in the medical industry, such as medical clinics, diagnostic companies, and physicians.

10. Based on my review of insurance billing records for Doctor-1, travel records for Doctor-1, and interviews with purported patients of Doctor-1, I have learned that Doctor-1 is engaged in a no-show billing insurance fraud scheme in which Doctor-1 bills insurance providers for medical services not rendered. A comparison of Doctor-1's insurance billing records and travel records shows that in numerous instances in 2020 and 2021, Doctor-1 billed for services provided at various clinic locations in New York City, including the Bronx, when Doctor-1 was not in New York City but in other parts of the United States. I have interviewed approximately six purported patients for whom Doctor-1 submitted insurance claims, and all six patients confirmed that they neither recognized Doctor-1 nor were treated by Doctor-1. Medical records included with insurance billing for these six patients show that descriptions purporting to assess the patients' medical conditions and quote the patients' statements are copied and pasted across patient files with identical or near-identical language, indicating the medical records are fraudulent. Based on my review of all these materials, I have learned that in or about 2020 and 2021,

5

Doctor-1 has submitted over at least approximately $350,000 in fraudulent no-show insurance billing claims.

11.  Based on my review of bank records for Doctor-1 for the period of approximately November 2020 to August 2021, I have learned that Doctor-1 made numerous payments to various shell companies, including the five shell companies described above in paragraph 9(c) that made numerous check deposits into the Company Bank Account.  Specifically, FBI has identified approximately 37 payments totaling approximately $260,527 from Doctor-1 to the five shell companies.

12.  Between in or about June 2021 to the present, CS-1 working at the direction of the FBI engaged in a series of transactions with CC-1 to cash checks and transmit funds abroad. CS-1 agreed to pay CC-1 a four percent fee for each of the transactions.  During the transactions, CS-1 represented to CC-1 that the funds were healthcare fraud proceeds.  Overall, CS-1 provided CC-1 with approximately fourteen checks totaling approximately $210,000.  The checks were issued from an FBI covert account held in the name of a fictitious company ("Sham Company-1").  Each of the checks listed an address in Manhattan for Sham Company-1.  Based on my review of bank records, I have learned that all but two of the checks worth approximately $30,000 were deposited into the Company Bank Account.  As described further below, evidence gathered during these transactions shows that SHUKHRATJON MIRSAIDOV, the defendant, conspired with CC-1 to execute these transactions using the Company Bank Account.

13.  On or about April 11, 2021, at the direction of the FBI, CS-1 went to JFK International Airport, where he met with and spoke to CC-1.  While at the airport, CS-1 observed CC-1, who was not an employee of the Company, hand multiple checks to an employee of the Company (not SHUKHRATJON MIRSAIDOV, the defendant). CC-1 informed CS-1, in substance, that CC-1 was engaged in money remitting, using funds obtained from the Company.

14.  On or about May 7, 2021, on a recorded call, CS-1 asked CC-1 to facilitate a transfer of $20,000 to recipients outside of the United States.  CS-1 explained that CS-1 had a $20,000 check, and CS-1 wanted to have $20,000 in U.S. currency

6

delivered to recipients abroad. CC-1 agreed to facilitate the transaction.[2]

15. To execute the transaction, on or about June 2, 2021, CS-1 met with CC-1 in Brooklyn, and the meeting was recorded. CS-1 gave CC-1 four checks totaling approximately $45,000 from Sham Company-1. CC-1 agreed to deliver an equivalent amount of U.S. currency to recipients located abroad, minus a four percent fee.

16. On or about June 14, 2021, on a recorded call, CS-1 and CC-1 discussed the pending foreign funds transfer. CC-1 asked CS-1, in substance, if CS-1 had monitored whether the checks were cleared by the Company, and CS-1 confirmed that the checks had cleared. CC-1 encouraged CS-1 to prepare an expense report for CS-1's company files showing the check payments were for plane tickets. In addition, CC-1 informed CS-1, in substance, that CC-1 could facilitate check cashing in the United States in addition to remitting funds abroad, but CC-1's fee for check cashing was no lower than for international remittances because every institution, *i.e.*, the Company, took its share of the fee during the transaction. In execution of this transaction, on or about June 16, and July 1, 2021, an associate of CS-1 located abroad received deliveries of U.S. currency totaling approximately $30,000, as coordinated by CC-1. CC-1 later agreed to provide CS-1 the remaining funds in New York, and on or about July 7, 2021, CC-1 delivered approximately $13,200 in U.S. currency to CS-1.

17. On or about June 22, 2021, in a recorded meeting, CS-1 provided CC-1 with a second round of checks from Sham Company-1 totaling approximately $45,000 in order to cash the checks in the U.S. CS-1 explained to CC-1, in substance and in part, that it was the "job" of the people controlling Sham Company-1 to "get money from Medicare" and that "they get money from the government for the people that do not exist." CC-1 agreed to take the checks despite CS-1's representation that the funds were healthcare fraud proceeds. In addition, CC-1 explained, in substance, that he would not be able to deposit the checks until July 4th because "the boss" was outside of the United States until then, and "the boss" would sign the checks upon his return. Based on my training, experience, and involvement in the investigation, I believe "boss" refers to SHUKHRATJON

---

[2] All recorded communications between CS-1 and CC-1 are in Uzbek. I have reviewed draft summary English translations prepared by a linguist.

7

MIRSAIDOV, the defendant. Based on my review of MIRSAIDOV's travel records, I have learned that MIRSAIDOV was outside of the United States from approximately June 18 to July 1, 2021, consistent with CC-1's representation that "the boss" was abroad during that time. CC-1 later provided CS-1 with U.S. currency in exchange for the checks provided on or about June 22, 2021.

18.    On or about July 14, 2022, in a recorded meeting, CS-1 provided CC-1 with checks totaling $45,000 from Sham Company-1 in order to cash the checks. During the meeting, CS-1 reiterated to CC-1, in substance, that the source of the checks was healthcare fraud. CS-1 stated, in substance, that the checks belonged to "the medical office." CC-1 responded by asking, in substance, if the person controlling Sham Company-1 used the name of people who were dead, and CS-1 responded, in substance, that they only used people who did not exist at all. CC-1 expressed concern, in substance, that "this" might get uncovered and result in the closing of Sham Company-1, but CC-1 suggested to continue the transactions with Sham Company-1. During the following months, CC-1 continued to accept checks from CS-1 and provide cash in exchange for the checks, minus a fee, and all the checks were deposited into the Company Bank Account. On several occasions, CC-1 delivered cash to CS-1 in Manhattan.

19.    Over the course of the check cashing transactions, CC-1 made representations to CS-1 indicating that CC-1 was working with SHUKHRATJON MIRSAIDOV, the defendant, to execute the check cashing. For example:

    a.    On or about August 24, 2021, on a recorded call, CS-1 told CC-1 that CS-1 would deliver a check directly to the Company's office in New Jersey because CS-1 was near the office and short on time. CC-1 directed CS-1 to deliver the check to SHUKHRATJON MIRSAIDOV, the defendant, at the office, and CC-1 stated, in substance, that CC-1 would inform MIRSAIDOV that CS-1 was on his way. At the office, CS-1 handed the check in an envelope to an employee of the Company and directed that employee to give the envelope to MIRSAIDOV. The check was later deposited into the Company Bank Account.

    b.    On or about September 14, 2021, CC-1 delivered approximately $33,700 in U.S. currency to CS-1 in Manhattan in exchange for checks CS-1 had previously provided to CC-1. CC-1 delivered the cash in a re-used box with a shipping label addressed to MIRSAIDOV's home address.

       c.  On or about October 13, 2021, during a recorded meeting, CC-1 described MIRSAIDOV, in substance, as the "chief person" with whom CC-1 worked at the Company. CS-1 asked CC-1, in substance, whether CC-1 gave MIRSAIDOV a portion of the fee. CC-1 responded, in sum and substance, that he gave MIRSAIDOV one and a half percent.

       20.  Based on my review of toll records, I have learned that SHUKHRATJON MIRSAIDOV, the defendant, and CC-1 communicate regularly. Between approximately June 2019 and June 2021, MIRSAIDOV's was the sixth most frequently contacted number for CC-1. Toll records also show MIRSAIDOV and CC-1 often communicated on dates that checks from Sham Company-1 were deposited in the Company Bank Account. In other instances, CC-1's outgoing calls to CS-1 were immediately preceded by an outgoing call to MIRSAIDOV.

       21.  On or about July 28, 2021, CS-1 had a recorded meeting with SHUKHRATJON MIRSAIDOV, the defendant, at the Company's office. During the meeting, MIRSAIDOV and CS-1 discussed the following, in substance and in part:

       a.  CS-1 explained, in substance, that CS-1 was approaching MIRSAIDOV directly instead of going through CC-1 because CC-1 owed CS-1 cash for $105,000 in checks CS-1 had previously provided to CC-1, and CC-1 was outside of the United States and not responding to CS-1.

       b.  In response, MIRSAIDOV began to explain, in substance, the check cashing scheme, prefacing the explanation by stating, "just so you are aware of our payment arrangements." MIRSAIDOV said, in substance, that CC-1 brought checks to the Company. MIRSAIDOV further stated, in substance and in part, that MIRSAIDOV did not know to whom the checks belonged, but MIRSAIDOV gave CC-1 cash in exchange for the checks right away. In the course of this conversation, MIRSAIDOV claimed, in substance, that CC-1 brought a lot of checks to MIRSAIDOV for "tickets" and that MIRSAIDOV did not receive a fee for the "payment arrangement" that he otherwise admitted to facilitating, but that CS-1 could increase the number of checks CS-1 gives to the Company by "ordering" "tickets" through the Company.[3]

---

[3] Based on my training, experience, and involvement in this investigation, I know that the check deposits from the shell companies and from Sham Company-1 are not payments to purchase airline tickets.

9

   c. CS-1 informed MIRSAIDOV that CS-1's checks were from a medical company. MIRSAIDOV asked CS-1, in substance, how CS-1 reflected the check payments in the financial reporting for CS-1's company. CS-1 responded, in substance, that the accounting was "totally clean," and the check deposits were reflected as business class tickets, in particular, in this instance, business class tickets for nine people for $105,000. CS-1 elaborated that CS-1 was caught by the IRS several years before, so now "everything [is] clean."

   d. CS-1 offered to work with MIRSAIDOV directly to cash checks. MIRSAIDOV asked, in response, how much CS-1 could give per month, and CS-1 responded $45,000 to $50,000 every ten days. MIRSAIDOV responded, in substance, that "our" turnover is $50,000 to $60,000 per month, which, from my experience in this investigation, I understand to have meant that the Company receives $50,000 to $60,000 in ticket sales per month, the cash from which can be used to cash checks. MIRSAIDOV informed CS-1 that MIRSAIDOV would consider CS-1's offer.

  22. In addition to the statements of SHUKHRATJON MIRSAIDOV, the defendant, explaining that MIRSAIDOV provided cash to CC-1 in exchange for checks, as described in paragraph 21(b), other evidence collected during the investigation indicates MIRSAIDOV and CC-1 fund the check cashing with cash obtained from flight ticket sales. For example, during a recorded meeting on or about October 13, 2021, CC-1 explained to CS-1, in substance, that CC-1's ability to do check cashing depends on the volume of ticket sales by the Company and varies depending on the Company's busy season for ticket sales.

  23. Later conversations recorded by an undercover agent (the "UC") further show that SHUKHRATJON MIRSAIDOV, the defendant, and CC-1 conspired together use the Company Bank Account to launder money and operate an unlicensed money transmitting scheme. On or about February 3, 2022, the UC had a recorded meeting with CC-1 to discuss cash that CC-1 owed for checks previously provided from Sham Company-1. CS-1 had previously introduced the UC to CC-1 as CS-1's boss in the scheme involving Sham Company-1. During the meeting, CC-1 stated, in substance and in part, that, of the four percent fee, CC-1 took two percent, and "one percent" and "one percent" went to "the company", *i.e.*, to SHUHKRATJON MIRSAIDOV, the defendant, and his partner at the Company. CC-1 also reassured the UC regarding the account CC-1 was using to deposit the

checks, explaining the account is the Company, "a big company." CC-1 promised to deliver the outstanding cash owed soon.

24.   On or about February 10, 2022, the UC had a recorded meeting with CC-1 to discuss the cash that was still owed in exchange for prior checks from Sham Company-1.  During this meeting, CC-1 confirmed, in substance and in part, that he provided approximately $50,000 in checks to the Company per week.  The UC requested a meeting with CC-1's boss, SHUHKHRATJON MIRSAIDOV, the defendant, because CC-1 was late with the cash payment.  CC-1 agreed to coordinate a meeting with MIRSAIDOV but refused to have the meeting at JFK Airport because there were too many cameras.

25.   On or about February 15, 2022, the UC had a recorded meeting with SHUHKHRATJON MIRSAIDOV, the defendant, at the Company's office.  MIRSAIDOV and the UC discussed the following, in substance and in part:

   a.   MIRSAIDOV confirmed that CC-1 is a "mutual friend."  The UC explained, in substance, that the UC was having a problem with CC-1 because CC-1 was late with payments.

   b.   The UC further explained that the UC, through CS-1, had been giving checks to CC-1, and the checks were deposited with the Company.  The UC stated that the UC assumed MIRSAIDOV was giving CC-1 cash.  The UC stated the UC did not believe payment was now delayed because MIRSAIDOV was late in paying CC-1 but because CC-1 was mismanaging the payments.

   c.   MIRSAIDOV expressed no surprise in response to the UC's description of the transactions, acknowledged that he received checks from CC-1, and expressed that CC-1 provided many checks.

   d.   The UC asked MIRSAIDOV, in substance, if the UC could work directly with MIRSAIDOV.  MIRSAIDOV responded, in substance and in part, that he would "like" to work directly with the UC and that it was "good" the UC wanted to work directly, but MIRSAIDOV was leaving the United States on the upcoming Sunday because the Company's parent company had reassigned him to another location.[4]

---

[4] During the conversation, MIRSAIDOV denied, in substance, that he or the Company took a fee for depositing the checks from CC-1 and claimed that the checks were for ticket purchases.  This

11

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of SHUKHRATJON MIRSAIDOV, the defendant, and that he be imprisoned or bailed, as the case may be.

/s/ sworn telephonically
_____
Special Agent Ali Amhaz-Strickland
Federal Bureau of Investigation

Sworn to before me this
17th day of February, 2022

*Gabriel W. Gorenstein*
_____
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

---

statement, however, is contradicted by MIRSAIDOV's interest to work directly with the UC to conduct check cashing for the UC, who expressed no interest in purchasing tickets from the Company. This statement is also contradicted by the transactions with CS-1, as no tickets were purchased with the Sham Company-1 checks.